1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10  FRANK TAYLOR,

11            Petitioner,              No. CIV S-06-2878 GEB CHS P

12      vs.

13  D.K. SISTO,

14            Respondent.          FINDINGS AND RECOMMENDATIONS

15  _____/

16            Petitioner is a state prisoner proceeding pro se with an application for a writ of

17  habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2003 conviction for

18  assault on a peace officer, case 02F07720 in the California Superior Court, County of

19  Sacramento.  Petitioner claims that (1) the trial court made comments to prospective jurors

20  during voir dire which implicated his Sixth Amendment rights; (2) the trial court erred in

21  denying his *Wheeler-Batson* challenges; (3) the jury was instructed with Section 2800.2 of the

22  California Vehicle Code, which contains an improper, unconstitutional  mandatory presumption;

23  and (4) the trial court mis-instructed the jury on Section 2800.2 by omitting  additional

24  instructions.  After  careful review of the record, this court recommends the petition be denied

25  for the reasons that follow.

26  /////

1

## I.  BACKGROUND

The following facts are drawn from the last reasoned state court decision concerning the conviction at issue, an unpublished opinion of the California Third District Court of Appeal, Case No. C043894[1]:

> On September 9, 2002, defendant's wife reported her car had been stolen, but after the offenses in question were committed she withdrew the claim.  At about 3:15 in the morning on September 10, 2002, Deputy John Halk, who was in uniform and in a marked patrol car, saw defendant driving the car and ran the license plate. When the dispatcher reported the car was stolen, Halk called for backup and followed defendant.  Eventually, defendant pulled into a driveway and Halk pulled his patrol car a few feet behind defendant; Deputy James Barnes also pulled his patrol car up, next to Halk.  The officers turned on their flashing lights and a "take down" spotlight.  Halk yelled out that he was a peace officer and ordered defendant, at gunpoint, to turn off his engine.  Instead, defendant backed his car until it touched the patrol car, then revved the engine, pushing the patrol car backwards.  To avoid being hurt by his open door, which was pushing Halk backwards, Halk jumped back into his car.  Defendant was able to drive on the sidewalk and so evade both officers, who, with other officers, gave chase.
>
> Defendant then drove through residential and commercial streets, reaching 60 to 100 miles per hour in areas with 25 to 35 mile-per-hour speed limits; he also ran many stop signs and at least one red light.  Eventually he crashed into a truck driven by Robert Lee, causing damage.  Defendant was captured nearby.

(Opinion at 2-3).

## II.  STANDARD OF REVIEW FOR GRANTING HABEAS RELIEF

An application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.

---

[1] Opinion is lodged in this record as Respondent's exhibit 6 (3/27/07).

1   *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149-50 (9th

2   Cir. 2000); *Middleton*, 768 F.2d at 1085.  Nor can habeas corpus be utilized to try state issues *de*

3   *novo.  Milton v. Wainwright*, 407 U.S. 371, 377 (1972).

4           This petition for writ of habeas corpus was filed after the effective date of, and

5   thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh*

6   *v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir.

7   1999).  Under AEDPA, federal habeas corpus relief is not available for any claim decided on the

8   merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

13  28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*,

14  529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

15          The "contrary to" and "unreasonable application" clauses of §2254(d)(1) are

16  different.  Under the "contrary to" clause of §2254(d)(1), a federal habeas court may grant the

17  writ only if the state court arrives at a conclusion opposite to that reached by the Supreme Court

18  on a question of law or if the state court decides the case differently than the Supreme Court has

19  on a set of materially indistinguishable facts.  *Williams*, 529 U.S. at 405.  As the Third Circuit has

20  explained, "it is not sufficient for the petitioner to show merely that his interpretation of Supreme

21  Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate

22  that Supreme Court precedent *requires* the contrary outcome."  *Matteo v. Superintendent, SCI*

23  *Albion*, 171 F.3d 877, 888 (3rd Cir. 1999) (en banc) (emphasis in original).  The state court is not

24  required to cite the specific controlling test or the Supreme Court authority, so long as neither the

25  reasoning nor the result of the state court decision contradict same.  *Early v. Packer*, 537 U.S. 3,

26  8-9 (2002).

1   /////

2        The court may grant relief under the "unreasonable application" clause if the state

3   court correctly identifies the governing legal principle from Supreme Court decisions but

4   unreasonably applies it to the facts of the particular case. *Williams*, 529 U.S. at 409-10.  The

5   focus of this inquiry is whether the state court's application of clearly established federal law is

6   objectively unreasonable. *Id*. at 410.  "[A] federal habeas court may not issue the writ simply

7   because that court concludes in its independent judgment that the relevant state-court decision

8   applied clearly established federal law erroneously or incorrectly.  Rather, that application must

9   also be unreasonable." *Id*.

10        This court will look to the last reasoned state court decision in determining

11   whether the law applied to a particular claim by the state courts was contrary to the law set forth

12   in the cases of the United States Supreme Court or whether an unreasonable application of such

13   law has occurred. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S.

14   919 (2003).  A court may deny habeas relief on the ground that relief is precluded by 28 U.S.C.

15   §2254(d) without addressing the merits of the claim. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

16   <u>III.  ANALYSIS OF PETITIONER'S CLAIMS</u>

17   A.  COMMENTS TO PROSPECTIVE JURORS DURING VOIR DIRE

18        At the beginning of jury selection, the trial court explained that "each side is

19   entitled to have a fair, unbiased and unprejudiced jury, so if there is any fact or any reason why

20   any of you might be biased or prejudiced in any way, you must disclose that fact or reasons to us

21   when you are asked to do so."  (RT at 31.[2])  The judge then explained that next to being a parent,

22   being a juror was the hardest job anybody could have:

23           The reason that being a [juror] is hard is because it's probably the
            only time in your life that you are ever asked to take all of the

24           experiences that you have had that have contributed to how you

25

26       [2] Reporter's Transcript on Appeal ("RT") is lodged in this record as Respondent's
    exhibits 11 & 12 (3/27/07).

4

think about everything that you think about and to lay those experiences aside and to only make your decisions based upon what

you hear that goes on in this trial, that you hear in this courtroom, and upon that, you must make your decision.

So I ask you to imagine ... that there is a large box at the doorway to this courtroom. And when you walk into this courtroom as a juror, you take all the decisions that you have made, all the opinions that you have about how people act, how people behave, what kind of people behave in what way, what makes them do that, and you leave them in that box. We call them your biases and your prejudices, and we all have them. We depend upon those biases and prejudices in our normal lives a lot of times, but you can't depend upon them when you are jurors.

The only thing that we ask you to walk into this courtroom with is your common sense, and that serves you well as a juror, and that's why it's the second hardest job in the world, but that's what we call upon you to do.

/////

(RT 31-32.)  There was no objection to these comments.

Petitioner claims his Sixth Amendment right to an impartial jury was violated when the potential jurors were instructed to ignore their life experiences and instructed that they "must confine their deliberations to common sense alone."  (Pet. at 5(A).)  Petitioner further claims that the instruction to confine deliberations to common sense alone "undermined the requirement of proof beyond a reasonable doubt."  (Pet. at 5(A).)

First, this Court agrees with the California Court of Appeal that, read in context, the instruction did not command the jurors to ignore all life experiences:

The jurors were told to lay aside their preconceptions, "your biases and your prejudices, and we all have them. We depend upon those biases and prejudices in our normal lives a lot of times, but you can't depend upon them when you are jurors."

(Opinion at 2.).  Nor was the jury instructed that they "must confine their deliberations to common sense alone."  The trial court directed the jurors to "walk into this courtroom with [only

1   your] common sense," (RT at 32) but later clearly instructed them to hold the people to the

2   reasonable doubt burden of proof in their deliberations:

> [A] defendant in a criminal action is presumed to be innocent until
> the contrary is proved, and in the event that there is a reasonable
> doubt as to whether the defendant's guilt has been satisfactorily
> shown, he is entitled to a verdict of not guilty.  This presumption
> places upon the People the burden of proving the defendant guilty
> beyond a reasonable doubt... Reasonable doubt is defined as
> follows: Reasonable doubt is not a mere possible doubt because
> everything relating to human affairs is open to some possible or
> imaginary doubt.  It is that state of the case which, after the entire
> comparison and consideration of all the evidence, leaves the minds
> of the jurors in that condition that they cannot say they feel an
> abiding conviction of the truth of the charge.

9   /////

10  (RT at 38.)

11          Petitioner has cited no case, and this court has found none, in which the United

12  States Supreme Court has held or suggested that such comments as were made here violate a

13  criminal defendant's constitutional right to an impartial jury or any other right under federal law.

14  There are no federal rules of law regarding the requirements of the Sixth Amendment relating to

15  charges to potential jurors about life experiences and/or common sense during voir dire.  To find

16  that the constitution dictates the comments made in this case were made in error would be to

17  require the application of a new rule of law, an exercise this court may not undertake in a habeas

18  corpus proceeding.  *Teague v. Lane*, 489 U.S. 28 (1989); *see also Hoffman v. Arave*, 236 F.3d

19  523, 537 (9th Cir. 2001), *cert. denied*, 534 U.S. 944 (2001) ("With few exceptions, the Teague

20  non-retroactivity doctrine prohibits courts from announcing new rules of law in federal habeas

21  proceedings.")  For these reasons, Petitioner's first claim must be rejected.

22  B.  PETITIONER'S *WHEELER-BATSON* CHALLENGES

23          Petitioner, an African-American, claims that the trial court erred in denying his

24  *Wheeler-Batson* challenges to the prosecutor's dismissal of three potential jurors, thereby

25  violating his Equal Protection rights.

26          In *Batson v. Kentucky*, 476 U.S. 79 (1986), the United States Supreme Court held

6

1   that the Equal Protection Clause prohibits a prosecutor from exercising peremptory challenges to

2   strike a venire person on the basis of race. *People v. Wheeler* is "the California counterpart to

3   *Batson*," (*Yee v. Duncan*, 463 F.3d 893, 896 (9th Cir. 2006)), however the standards of *Batson*

4   control this court's disposition of the case. *Lewis v. Lewis*, 321 F.3d 824, 827 & n.5 (9th Cir.

5   2003).

6           In order to prevail on a *Batson* claim, a defendant must first establish a prima facie

7   case of purposeful discrimination. *Batson*, 476 U.S. at 96-97; *Lewis v. Lewis*, 321 F.3d 824, 830

8   & n.18 (9th Cir. 2003); *United States v. DeGross*, 960 F.2d 1433, 1442 (9th Cir. 1992) (en banc).

9   "To establish a prima facie case, the defendant must show that 'he is a member of a cognizable

10  racial group,' *Batson*, 476 U.S. at 96, and that 'the facts and circumstances of the case "raise an

11  inference" that the prosecution has excluded venire members from the petit jury on account of

12  their race." *McClain v. Prunty*, 217 F.3d 1209, 1219-20 (9th Cir. 2000) (quoting *Wade v.*

13  *Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000)). In deciding whether a defendant has made the

14  requisite showing, the trial court should consider all relevant circumstances. *Batson*, 476 U.S. at

15  96.

16          If a prima facie case is made out, "the burden shifts to the State to come forward

17  with a neutral explanation for challenging" the juror in question. *Batson*, 476 U.S. at 97.

18  *DeGross*, 960 F.2d at 1442; *Stubbs*, 189 F.3d at 1104. "The prosecution's challenges need not

19  rise to the level justifying use of a challenge for cause." *United States v. Power*, 881 F.2d 733,

20  740 (9th Cir. 1989) (citing *Batson*, 476 U.S. at 97-98). Rather, "[a] neutral explanation in the

21  context of our analysis here means an explanation based on something other than the race of the

22  juror." *McClain*, 217 F.3d at 1220 (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991)).

23  "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless

24  a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be

25  deemed race-neutral." *McClain*, 217 F.3d at 1220 (quoting *Stubbs*, 189 F.3d at 1105).

26          At the third step of this inquiry, "the trial court must determine whether the

7

1  defendant has carried his burden of proving purposeful discrimination." *McClain*, 217 F.3d at

2  1220 (quoting *Hernandez*, 500 U.S. at 359); *see also Batson*, 476 U.S. at 98.  The court must

3  evaluate the prosecutor's reasons and make a credibility determination.  *Lewis*, 321 F.3d at 830;

4  *McClain*, 217 F.3d at 1220.  As with any credibility determination, the court's own observations

5  are of significant importance.  *Batson*, 476 U.S. at 98, n.21; *see also Lewis*, 321 F.3d at 830.  A

6  comparative analysis of the struck juror with empaneled jurors "is a well-established tool for

7  exploring the possibility that facially race-neutral reasons are a pretext for discrimination."

8  *Lewis*, 321 F.3d at 830.  If a review of the record undermines the prosecutor's stated reasons, or

9  many of the stated reasons, the explanation may be deemed a pretext.  *Id*.  The proffer of various

10  faulty reasons and only one or two otherwise adequate reasons may undermine the prosecutor's

11  credibility to such an extent that a court should sustain a Batson challenge.  *Id*. at 831.

12          On the other hand, the fact that a prosecutor's reasons may be "founded on nothing

13  more than a trial lawyer's instincts about a prospective juror" does not diminish the scope of

14  acceptable invocation of peremptory challenges, so long as they are the actual reasons for the

15  prosecutor's actions."  *Power*, 881 F.2d at 740 (quoting *United States v. Chinchilla*, 874 F.2d 695,

16  699 (9th Cir. 1989)).  "Excluding jurors because of their profession, or because they were

17  acquitted in a prior case, or because of a poor attitude in answer to voir dire questions is wholly

18  within the prosecutor's prerogative."  *United States v. Thompson*, 827 F.2d 1254, 1260 (9th Cir.

19  1987).  "Evidence in the record of objective reasons to strike a juror implies that racial bias did

20  not motivate the prosecutor."  *Boyd v. Newland*, 393 F.3d 1008, 1013 (9th Cir. 1987).

21          In this case, the jurors in question were Juror L., an Asian man, Juror W., a woman

22  who may have been Hispanic, and Juror D., an African-American woman.  As the California

23  Court of Appeal noted, the trial court found a prima facie case only as to the first two.  (Opinion

24  at 6.)  However, the record contains the prosecutor's explanations for the dismissal of each juror.

25  The state appellate court assumed that the trial court had found a prima facie case of purposeful

26  discrimination on all three individuals and gave a reasoned decision with respect to the ultimate

question of intentional discrimination.  (Opinion at 6.)  Thus, this court need not address the

preliminary issue of whether Petitioner established a prima facie case of purposeful

discrimination, but may proceed directly to the third step of the *Batson* analysis.  *See Collins v.*

*Rice*, 365 F.3d 667, 677 n.6 (9th Cir. 2004) (overruled on other grounds, 546 U.S. 333 (2006)).

The state appellate court fairly summarized the facts surrounding the dismissal of the three

potential jurors and concluded as follows:

A. Juror L.

> Juror L. was Asian and had asked for a hardship excuse, because he
> had recently graduated and was living with his parents and needed
> to help them pay their rent and bills. L. thought an
> African-American defendant might not have been treated fairly and
> he (L.) "might have a tough time" putting that view in the "box".

> The prosecutor believed L. was very young and "has little life
> experience that makes for a good juror. I don't think I ever kept
> anybody on the panel that was of his age, his youthfulness due to
> the fact that I believe a good juror would have certain life
> experiences." The prosecutor also found L. soft spoken and
> therefore perhaps less "willing to engage in deliberations." As a
> minor reason "I factored in that he tried to get out of jury duty,
> didn't want to be here." More importantly, L. raised his hand when
> asked if "defendant because of his race is more likely innocent
> [than] somebody of a different race."

> The trial court accepted this explanation.

> Defendant contends the trial court failed to conduct an adequate
> inquiry into the prosecutor's reasons. But youthful appearance and
> lack of life experience are race-neutral explanations.  (People v.
> Sims (1993) 5 Cal.4th 405, 429-431; Perez, supra, 29 Cal.App.4th
> at pp. 1328 [college students].)  Defendant claims youth is an
> impermissible reason, absent an explanation of how that would
> impact this case.  (See Collins v. Rice (9th Cir.2003) 365 F.3d 667,
> 679-680.)  But the prosecutor provided such an explanation: The
> prosecutor explained that this juror was younger than any he had
> ever allowed on a jury and lacked substantial life experience. L. still
> lived at home with his parents and was soft-spoken, which amply
> supports the prosecutor's reason.

> Further, the trial court was in the best position to determine the
> validity of the prosecutor's concern that L. might not assert himself
> sufficiently during deliberations.  Juror conduct which may support
> a challenge is "often subtle, visual, and therefore incapable of being
> transcribed, subjective, and even trivial."  ( People v. Walker (1998)

9

64 Cal.App.4th 1062, 1067.)   Further, although defendant quibbles with the strength of the statement, L. said he believed African-Americans might have a harder time receiving fair treatment.  That, too, is a valid reason.

Defendant parses each reason and provides an alternative view, but that does not show that the trial court erred by accepting the prosecutor's claim.  For example, appellate counsel claims the prosecutor relied on "a timidity that [L.] did not display" but the trial court was in the best position to evaluate L.'s voice and body language.  The record reflects ample support for the grounds stated by the prosecutor and there was no need for further inquiry.

In the supplemental briefing defendant contends the prosecutor's reliance on L.'s claim of financial hardship was suspicious because Juror No. 6 had a concern about the length of jury service, based on prior service on a jury, but was not challenged.  As indicated in our original opinion, financial hardship was not one of the significant reasons given by the prosecutor, but Juror L.'s youth, lack of life experience, and view that African-Americans are not always treated fairly by the justice system.  Further, Juror No. 6 did not tie his concerns about length of service to financial hardship. Therefore, the comparison is inapt.

### B. Juror W.

It is not clear what W.'s ethnicity was, but we will assume she was Hispanic, as trial counsel asserted.  She had two brothers involved with crime who had been imprisoned and she hesitated when asked if she would evaluate a peace officer's testimony by the same standards as other witnesses.  She had witnessed so many crimes she said it would be too "tedious" to list them on her questionnaire.  Her house (a former drug house) had been raided by "about 20 undercover cops" when they thought a prior occupant was still there, an experience she found "devastating."

The prosecutor said he did not know W.'s ethnicity and perforce did not excuse her based on race.  She had close relatives imprisoned for drug offenses, had witnessed many crimes and had apparently moved into what had been a drug house. During the raid "she had officers, I think, she said rushed in, 20 or so of them," an experience she found devastating.  Based on these factors, the prosecutor believed W. might harbor bias against law enforcement.

The trial court accepted this explanation.

The reasons given were plausible and race-neutral. The prosecutor's feeling that W. may have a negative view of law enforcement due to her personal experiences was amply supported by her voir dire testimony and nothing in the record even hints that these reasons were pretextual.

10

In our opinion we declined to consider a comparative juror analysis as to Juror W., in obedience to then-binding California Supreme Court precedent. In making a purported comparative analysis, defendant points out that some venire members had drunk-driving arrests or convictions, or relatives with similar arrests, but went unchallenged.

Defendant glosses over significant facts about W., namely, that she had witnessed so many crimes she could not list them, and she had been present during a traumatic raid on a former drug house. Defendant claims "Seated jurors complained of similar unpleasant experiences with law enforcement," but this is not accurate: None of the seated jurors mentioned in support of this claim underwent anything like this event. The specifics of the unpleasantries counsel mentions are as follows:

Juror No. 1 had been arrested for a DUI and felt he was a victim of an unfair field sobriety test, but felt he could be fair. W. is not comparable.

Juror No. 2 had one brother who served time for burglary and another brother who had been arrested in the 1980's and "claims he was assaulted by the police department. Nothing was ever filed about it." Defendant states Juror No. 2's family was "traumatized" by these events, but there is no such testimony in the record citations supplied.  W. is not comparable.

Juror No. 4 was involved in a criminal fraud investigation by the federal government:  His employer was an investment company which failed and "I ended up testifying two hours about my knowledge before a grand jury without the benefits of counsel before a grand jury.  My boss eventually plea bargained. [Q.] Were you charged with anything yourself? [A.] No, I was a subject, not a target."  This had made him "uncomfortable" but he testified he could be fair in this case. Many years ago he had had a prior "negative experience" with "one particular officer" although he testified he has positive feelings for law enforcement. W. is not comparable to this juror.

Juror W.'s personal and family police contacts went far beyond the norm, particularly given the devastating police raid she experienced when she apparently was living in a former drug house, and the fact that she had witnessed so many crimes she could not list them. These facts render all of the comparisons tendered by counsel inapt.

Defendant asserts the prosecutor had a duty to inquire further, but Juror W.'s life experiences were amply explained.  We do not agree that the failure to explore her past more deeply tends to show pretext:  What the prosecutor already knew was enough for any rational prosecutor to challenge this juror.

11

C. Juror D.

Juror D. was the only African-American woman on the panel. She had twice been victimized by African-American men; once two men tried to kidnap her at gunpoint and once she was sexually assaulted by a companion who was not arrested. She became very emotional describing these incidents. She knew African-Americans who had been pulled over while driving because of their race. Her brother had been convicted of burglary and shoplifting. She had sat on a civil and a criminal jury, and said she had "frequently" disagreed with other jurors. She "could possibly" have negative feelings toward law enforcement.

The prosecutor explained that D. had "emotional baggage" and became "quite emotional" during a private voir dire session and had expressed hesitation about putting her biases in the "box". Further, she raised her hand to indicate it was more likely an African-American would be treated unfairly and she had said she had had a negative experience toward law enforcement. The trial court accepted these reasons, although it did not find a prima facie case had been shown.

On appeal defendant claims there is no support for the finding D. became emotional, or was emphatic about her negative experience with law enforcement, but the trial court judge was in the best position to evaluate the juror's in-court reactions. Defendant parses each reason and posits alternative explanations, but this does not show that the prosecutor's reasons for wanting D. off the jury were insincere or a mask for discrimination.

In making a purported comparative analysis in his supplemental brief, defendant ignores the significant reason the prosecutor gave for challenging D, that she had been the victim of crimes by African-Americans. He only mentions "Juror D had a brother convicted of burglary and shoplifting ... and a negative experience with law enforcement[.]" The point that certain other jurors had relatives with arrests or convictions does not make them comparable to D.; none had experienced sexual assaults and none had Juror D.'s negative prior jury experience, where she "frequently" disagreed with other jurors. No prosecutor wants a hold-out juror, and D.'s statement about her prior service raised an obvious red flag.

Further, as the Attorney General points out, D. became very emotional when discussing her past victimization, believed the police should not pursue cars for minor offenses, believed police sometimes engaged in racially motivated stops and stated that she may harbor anti-police feelings. The record supports each of these points. Given that the facts of this case involved an African-American defendant who allegedly fled in the car from police, her beliefs about car chases by police, and her possible

1  anti-police feelings amply support the challenge.

2  (Opinion at 9-15.)

3  After reviewing the record, this court has determined that the state appellate

4  court's disposition of Petitioner's *Wheeler-Batson* claim is not contrary to or based on an

5  unreasonable application of clearly established federal law nor did it result in a decision that was

6  based on an unreasonable determination of the facts in light of the evidence presented in the state

7  court proceeding.  The conclusion of the state appellate court that the prosecutor did not exercise

8  peremptory challenges based on membership in a particular group is supported by the record.

9  The prosecutor expressed reasonable bases for the use of peremptory challenges against jurors L.,

10  W., and D.  The stated reasons were "clear and reasonably specific," (*Purkett v. Elem*, 514 U.S.

11  765, 768-69 (1995)), as well as race-neutral.  There is no indication in the record that the reasons

12  were pretextual.

13  This court also rejects Petitioner's argument that the prosecutor's alleged

14  discriminatory motive is demonstrated by his retention of other  jurors with similar characteristics

15  to Juror W. and Juror D.  As the California Court of Appeal explained, the retained jurors did not

16  have "comparable characteristics" with prospective jurors L., W. And D.  This court agrees that

17  Petitioner glosses over significant facts relating to Jurors L., W. and D. and exaggerates facts

18  relating to other retained jurors in an attempt to make reasonable comparisons.  Petitioner's

19  *Wheeler-Batson* motions were appropriately denied.  Petitioner's claim regarding the prosecutor's

20  use of peremptory challenges at trial must be rejected.

21  C.  SECTION 2800.2 OF THE CALIFORNIA VEHICLE CODE

22  Petitioner claims that the felony statute under which he stands convicted, section

23  2800.2, contains an unconstitutional and improper mandatory presumption because wantonness

24  may be presumed if a jury finds a defendant violates three defined traffic violations or causes

25  property damage.  (Pet. at 5(B).)

26  Petitioner raised this claim in direct appeal before the state appellate court.  The

1  California Court of Appeal agreed with the rule announced in *People v. Pinkston* (112 Cal. App.

2  4th (2nd Dist. 2003)), that section 2800.2 does not create an impermissible mandatory

3  presumption or irrational permissive inference but instead provides alternate definitions of the

4  offense.  (Opinion at 16-17.)  The state appellate court's interpretation and analysis of the state

5  statute may not be challenged in this federal habeas corpus action.  *Estelle v. McGuire*, 502 U.S.

6  62, 67-68 (1991) ("It is not the province of a federal habeas court to reexamine state-court

7  determinations on state-law questions"); s*ee also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)

8  ("We have repeatedly held that a state court's interpretation of state law, including one announced

9  on direct appeal of the challenged conviction, binds a court sitting in habeas corpus").

10         However, to the extent Petitioner claims that the jury instruction on section 2800.2

11  contained an impermissible mandatory or permissive presumption of intent, this court will review

12  the claim for a federal due process violation.  Federal due process is violated by jury instructions

13  which use mandatory or permissive presumptions to relieve the prosecution's burden of proof on

14  any element of the crime charged.  *Francis v. Franklin*, 471 U.S. 307, 314 (1985); *see also*

15  *Sandstrom v. Montana*, 442 U.S. 510 (1979).

16         In general, "[a] mandatory presumption instructs the jury that it must infer the

17  presumed fact if... certain predicate facts" are proved.  *Francis*, 471 U.S. at 314.  The due process

18  clause is implicated where the presumed fact is an element of the prosecution's case, because in

19  that situation, proof of predicate facts will either remove the presumed element from the State's

20  case altogether or will shift the burden of persuasion on the presumed element to the defendant.

21  *Id.* at 317.  On the other hand, a permissive presumption allows, but does not require, the trier of

22  fact to infer the elemental fact from proof of the basic fact.  *County Court of Ulster Cty. v. Allen*,

23  442 U.S. 149, 157 (1979).  In order for such a presumption to pass constitutional muster, it must

24  be said with substantial assurance that "the presumed fact is more likely than not to flow from the

25  proved fact on which it is made to depend."  *Leary v. United States*, 395 U.S. 6, 36 (1968).

26  Similarly, there must be a "rational connection between the fact proved and the ultimate fact

14

1   presumed" -- a connection grounded in "common experience." *Tot v. United States*, 319 U.S.

2   463, 467-68 (1943).  Notwithstanding the label placed on an evidentiary presumption, the

3   ultimate test of its constitutionality remains constant: "[t]he device must not undermine the fact

4   finder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts

5   beyond a reasonable doubt." *Ulster Cty.*, 442 U.S. at 156 (citing *In re Winship*, 397 U.S. at 364).

6          Under Section 2800.1(a) of the California Vehicle Code, it is a misdemeanor to

7   attempt to elude a peace officer while operating a motor vehicle under specified circumstances.

8   Under section 2800.2(a), the offense becomes a "wobbler"[3] if "the pursued vehicle is driven in a

9   willful or wanton disregard for the safety of persons or property."  Subsection (b) adds that "[f]or

10  purposes of this section, a willful or wanton disregard for the safety of persons or property

11  includes, but is not limited to, driving while fleeing or attempting to elude a pursuing peace

12  officer during which time either three or more violations that are assigned a traffic violation point

13  count under Section 12810 occur, or damage to property occurs."

14         This court agrees with the California Court of Appeal that the instruction on

15  section 2800.2 did not create any presumption at all:

16              Instead, it gives alternate definitions of the crime.  The People can
               prove wantonness by ordinary means, or can prove the specified
17              traffic violations took place, or can prove that property damage
               occurred.  The statute simply embodies a legislative determination
18              that when an individual commits three moving violations or causes
               property damage while evading a police officer, he has committed a
19              felony.  Thus it establishes a rule of substantive law rather than a
               presumption apportioning the burden of persuasion concerning
20              certain propositions or varying the duty of coming forward with the
               evidence...  Further, it was not irrational for the Legislature to treat
21              evading a peace officer as a felony in cases where property damage
               occurs or the defendant violates three traffic safety laws.

22

23  (Opinion at 18.)  The challenged statutory instruction does not tell the jury that it must infer any

24  fact nor does the instruction shift the burden of proof to the defense or relieve the state from its

25  _____

26          [3] A "wobbler" offense is one that can be punished as either a misdemeanor or a felony
        under applicable law.  *See Ferreira v. Ashcroft*, 382 F.3d 1045, 1051 (9th Cir. 2004).

1    burden to prove the charged crime beyond a reasonable doubt.  Petitioner's jury was clearly

2    instructed that "[e]ach fact which is essential to complete a set of circumstances necessary to

3    establish the defendant's guilt must be proved beyond a reasonable doubt."  (RT at 444.)  No

4    presumption relieved the State of its constitutional obligation to prove beyond a reasonable doubt

5    every essential element of the crime with which Petitioner was charged.  The opinion of the

6    California Court of Appeal was not contrary to, nor did it involve an unreasonable application of,

7    federal law.  Accordingly, this claim must also be rejected.

8    D.  MIS-INSTRUCTION TO THE JURY ON SECTION 2.800

9        A claim of instructional error does not raise a cognizable federal claim, unless the

10   error "so infected the entire trial that the resulting conviction violates due process." *Estelle v.*

11   *McGuire,* 502 U.S. 62, 71-72, (1991); *see also Henderson v. Kibbe,* 431 U.S. 145, 154 (1977);

12   *Cupp v. Nauhten,* 414 U.S. 141, 146-47 (1973).  Moreover, "not every ambiguity, inconsistency,

13   or deficiency in a jury instruction rises to the level of a due process violation."  *Middleton v.*

14   *McNeil,* 541 U.S. 433, 437 (2004).

15       When the claim of error rests on a trial court's failure to give an instruction, the

16   petitioner must show not only that the failure to give the instruction was error, but also that the

17   error so infected the entire trial that he was deprived of his constitutional right to a fair trial.

18   *Henderson,* 431 U.S. at 154.  Because an omitted instruction is less likely to be prejudicial than a

19   misstatement of the law, a petitioner seeking habeas relief based on a failure to give a particular

20   instruction bears an especially heavy burden.  *Id.* at 155.

21       In this case, petitioner claims that the trial court erred in failing to instruct, sua

22   sponte, on the particular vehicle code offenses that support a finding of willful or wanton

23   misconduct under section 2800.2(b).  (Pet. at 6-6A.)  As to this ground, the state appellate court

24   reasoned:

25           The trial court instructed with CALJIC No. 12.85, which told the
            jury it had to find defendant acted with "willful or wanton disregard
26          for the safety of persons or property" and added: "A willful or

16

1
2
3
4
5

wanton disregard for the safety of persons or property includes, but is not limited to, driving while fleeing or attempting to elude a pursuing peace officer during which time the person driving commits three or more Vehicle Code violations, or causes damage to property.  'Willful or wanton' means an act or acts intentionally performed with a conscious disregard for the safety of persons or property. It does not necessarily include an intent to injure." Defendant contends the failure to instruct on the elements of the underlying traffic violations (speeding and disobeying signals) requires reversal.

6
7
8

Defendant points out (as we explained in the last section) that not all Vehicle Code violations result in "points" and jurors cannot be expected to know which ones do and which ones do not, in the absence of an instruction.

9
10
11
12
13

The evidence was undisputed that defendant disobeyed more than three signals without stopping (or indeed, without slowing down). Section 21461 prohibits "fail[ure] to obey any sign or signal" and section 12810, subdivision (e) provides that a conviction of an offense "involving the safe operation of a motor vehicle upon the highway" results in one point, with exceptions not here relevant. As a matter of law, running stop signs and lights reflects unsafe operation of a motor vehicle.

14
15

Further, the relevant speed limits were 25 and 35 miles per hour, whereas defendant concedes the evidence shows he drove 40 to 100 miles per hour at various points. Ordinary speeding is a one-point violation; driving over 100 miles per hour is a two-point violation.

16
17
18
19

(§§ 22348, subd. (b), 22349, 22350, 12810, subds. (d)(1) & (e).) Thus, the alleged omitted instructions (the definitional elements of the subsidiary Vehicle Code violations) did not pertain to matters which were factually disputed and any error was harmless.  (*People v. Flood* (1998) 18 Cal.4th 470, 504-507; *People v. Mayfield* (1997) 14 Cal.4th 668, 774; *Yates v. Evatt* (1991) 500 U.S. 391 [114 L.Ed.2d 432].

20
21
22
23

Finally, as the People point out, it is not disputed that defendant caused property damage. Once the jury found all the other elements of the offense of evading a peace officer, the property damage showed the required wantonness as a matter of law.   No instruction defining "damage to property" (§ 2800.2, subd. (b)) was required, because jurors would understand that phrase as a phrase of common understanding. (See *People v. Jones* (1971) 19 Cal.App.3d 437, 447.)

24   /////

25   (Opinion at 9-10.)

26

For the reasons identified by the California Court of Appeal, this court finds that

17

1   the trial court's failure to instruct jurors as petitioner suggests did not so infect the entire trial that

2   he was deprived of his right to due process.  Accordingly, this claim must also be rejected.

3                                        IV.  CONCLUSION

4                  For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that

5   Petitioner's application for a writ of habeas corpus be denied.

6                  These findings and recommendations are submitted to the United States District

7   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

8   days after being served with these findings and recommendations, any party may file written

9   objections with the court and serve a copy on all parties.  Such a document should be captioned

10  "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

11  within the specified time may waive the right to appeal the District Court's order. *Turner v.*

12  *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

13  DATED: November 7, 2008

14  2tayl2878.157

15                                              CHARLENE H. SORRENTINO
                                                UNITED STATES DISTRICT COURT

16

17

18

19

20

21

22

23

24

25

26

18